**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MATTHEW R. HULSTINE, | CASE NO. 1:15-cv-00774-CCC-GBC |
| Plaintiff, | (CHIEF JUDGE CONNER) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | Docs. 1, 9, 10, 11, 12 |

<u>REPORT AND RECOMMENDATION</u>

## I.    Introduction

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Defendant") denying the application of Matthew R. Hulstine ("Plaintiff") for disability insurance benefits ("DIB") under the Social Security Act, 42 U.S.C. §§401-433, 1382-1383 (the "Act") and Social Security Regulations, 20 C.F.R. §§404.1501 *et seq.* (the "Regulations").Plaintiff submitted a treating source opinion supported by objective medical findings. Doc. 10. The only evidence inconsistent with this opinion, aside from the ALJ's lay reinterpretation of evidence, was a single non-treating, non-examining medical opinion from a source who did not review a complete record. Doc. 10.

The ALJ "must…adopt" any medical opinion entitled to controlling weight. SSR 96-5p. The Regulations afford special deference to treating sources ("treating source rule"). The ALJ must assign controlling weight to any well-supported treating source medical opinion unless the ALJ identifies substantial inconsistent evidence. *See* 20 C.F.R. §404.1527(c)(2). The Third Circuit consistently holds that lay reinterpretation of medical evidence is not substantial evidence to decline to adopt a treating source medical opinion. *Burns v. Colvin,* No. 1:14–CV–1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). The Regulations retained, rather than abrogated, this precedent. *Id.* Thus, the ALJ may not assign less than controlling weight to a well-supported treating source medical opinion with lay reinterpretation of medical evidence. The Third Circuit has also held that a medical opinion from a non-treating, non-examining source who did not review a complete record was "not substantial." *Morales v. Apfel*, 225 F.3d 310 (3d Cir. 2000). In *Brownawell v. Comm'r Of Soc. Sec.*, 554 F.3d 352 (3d Cir. 2008), the only other precedential decision addressing an ALJ who relied on a non-treating, non-examining source who did not review a complete record to reject a treating source opinion, the Third Circuit also remanded. *See Brownawell*, 554 F.3d at 352. In contrast, in *Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011), the Third Circuit affirmed where there were two non-treating opinions, one from a source who reviewed the entire record. *Id.* Other cases frequently cited by Defendant,

*Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008); and *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999), do not address assigning less than controlling weight to a treating source medical opinion with a non-treating source, so they are dicta as applied to this case.

This case law is consistent with SSR 96-6p, which provides that an ALJ may only credit a non-treating, non-examining source over a treating source in "appropriate circumstances," such as when the non-treating, non-examining source was able to review a "complete case record…which provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.* This may be only an example of "appropriate circumstances," but the phrase should be construed as requiring a similarly compelling reason. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("the general term should be understood as a reference to subjects akin to the one with specific enumeration").

*Morales*, *Brown*, and SSR 96-6p are all consistent with the prohibition on lay reinterpretation of evidence, because a source who reviews a complete record obviates the need for the ALJ to reinterpret medical evidence. Read together, 20 C.F.R. §404.1527(c)(2), SSR 96-6p, SSR 96-5p, *Morales*, *Brownawell*, and *Brown* indicate that, generally, the ALJ will lack substantial evidence to assign less than

controlling weight to a treating source opinion with only lay reinterpretation of medical evidence or an opinion from a non-treating, non-examining source who did not review a complete record. Harmonizing the Regulations, case law, SSRs, and other sources of authority into a consistent statement of the law regarding the treating physician rule reflects "the need for efficient administration of an obligatory nationwide benefits program" given "more than 2.5 million claims for disability benefits [filed] each year" because "the treating physician rule works to foster uniformity and regularity in Social Security benefits determinations made in the first instance by a corps of administrative law judges." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 833, 123 S. Ct. 1965, 1971, 155 L. Ed. 2d 1034 (2003) (internal citations omitted).

The Court finds that the ALJ failed to provide a sufficient reason to reject the treating source opinion. "Despite the deference due to administrative decisions in disability benefit cases, "[Courts] retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano,* 637 F.2d 968, 970 (3d Cir.1981)).The Court recommends that Plaintiff's appeal be granted, the decision of the Commissioner be vacated, and the matter be remanded for further proceedings and proper evaluation of the medical opinions.

## II.   Procedural Background

On February 5, 2010, Plaintiff applied for DIB. (Tr. 414-20). On July 21, 2010, the Bureau of Disability Determination ("state agency") denied Plaintiff's application (Tr. 285-93), and Plaintiff requested a hearing. (Tr. 321). On January 3, 2012, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 209-243). On February 25, 2012, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 394-311). Plaintiff requested review with the Appeals Council (Tr. 15-17), which the Appeals Council granted on November 1, 2012, remanding the case to the ALJ. (Tr. 312-15). On August 22, 2013, an ALJ held a hearing at which Plaintiff—who was represented by an attorney—and a vocational expert ("VE") appeared and testified. (Tr. 244-84).  On October 31, 2013, the ALJ found that Plaintiff was not entitled to benefits. (Tr. 189-208). Plaintiff requested review with the Appeals Council, which the Appeals Council denied on February 20, 2015, affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6). *See Sims v. Apfel*, 530 U.S. 103, 107 (2000).

On April 20, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal the decision of the Commissioner. (Doc. 1). On June 23, 2015, the Commissioner filed an answer and administrative transcript of proceedings. (Docs. 9, 10). On July 29, 2015, Plaintiff filed a brief in support of

the appeal ("Pl. Brief"). (Doc. 11). On August 31, 2015, Defendant filed a brief in response ("Def. Brief"). (Doc. 12). Plaintiff declined to file a brief in reply. (Doc. 18). On January 11, 2016, the Court referred this case to the undersigned Magistrate Judge. The matter is now ripe for review.

### III.    Standard of Review and Sequential Evaluation Process

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part

404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. *Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum*

*v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)

(citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## IV.    Relevant Facts in the Record

### A.    Overview

Plaintiff was born in 1974 and was classified by the Regulations as a younger individual through October 31, 2013, the date of the ALJ decision. (Tr. 189-208); 20 C.F.R. § 404.1563. Plaintiff has at least a high school education and past relevant work as a warehouse worker and forklift operator. (Tr. 203). Plaintiff alleges disability as a result of multiple deep vein thromboses and pulmonary embolism secondary to hypercoagulable state, coronary artery disease with angina (status post heart attack), prothrombin factor II clotting deficiency, chronic back pain with sciatica, lumbar degenerative disc disease, bipolar disorder, anxiety, adjustment disorder, and narcissistic personality disorder. (Tr. 218, 254, 256, 260, 262, 927, 990, 1066). Plaintiff worked through January of 2010. (Tr. 512). Plaintiff was diagnosed with deep venous thrombosis ("DVT") in May of 2000, while serving in the United States Marine Corps. (Tr. 228, 1114, 1117). Plaintiff continued serving in the Marine Corps until 2001. (Tr. 228). He suffered another DVT in 2001, resulting in pulmonary embolism and requiring installation of an inferior vena cava filter. (Tr. 880-83, 928, 1049-50). He was medically discharged "because of pulmonary embolism problems." (Tr. 874).

Plaintiff continued working after the honorable discharge from the Marine Corps, but suffered residual saphenous nerve damage caused by the DVTs. (Tr. 927, 1049-50). In June of 2005, a spinal cord stimulator was implanted to treat the residual nerve damage. (Tr. 927, 1049-50). Plaintiff underwent two inpatient psychiatric hospitalizations in 2006, one for a suicide attempt. (Tr. 224). The Lebanon Veterans Affairs Medical Center ("VAMC") diagnosed bipolar disorder and anxiety. (Tr. 1066). Plaintiff had a heart attack in 2009 requiring cardiac catheterization and stents. (Tr. 520-23, 539-49, 927-28, 1049-50, 1171). Three months later, "he was having recurrent pain, and it was found that the stent had restenosed. He underwent subsequent stenting." (Tr. 927). Plaintiff's spinal cord stimulator failed in 2009, and was not replaced until July of 2010, six months after he stopped working. (Tr. 236, 512, 608-10, 619-23, 1041-42, 1057-58). Plaintiff presented to the emergency room on multiple occasions, and left against medical advice when he was informed that he would have to wait for additional testing. (Tr. 735, 1149, 1177, 1197).

Plaintiff reported and testified that she could perform some activities of daily living on a sporadic and transitory basis that allowed for breaks as needed. Plaintiff testified that he had constant back pain radiating to his legs, angina, swelling in his legs, shortness of breath on exertion, mania, problems handling stress, depression, isolation, mood swings, trouble sleeping, and difficulty walking, standing, and

sitting. (Tr. 216-10, 220-33, 254-50, 258-68). Plaintiff was able to change a flat tire, attend college classes, perform personal care activities, perform some chores, drive a car, manage money, attend sporting events, attend church, swim, and go to the movies. (Tr. 202, 459-63, 599). Plaintiff attended some college classes for one semester, in the Spring of 2010. (Tr. 1017). He was enrolled for an introductory reading course in the fall 2010 semester, but academic records indicate that he "never attended class." (Tr. 1017.)

On March 2, 2012, Dr. John Movassaghi, M.D. authored an opinion that Plaintiff's cardiac conditions caused a "marked limitation of physical activity," with fatigue and dyspnea after "less than ordinary (mild) physical activity." (Tr. 1136). On May 6, 2012, Plaintiff's treating physician, Dr. Charles Scogno, M.D., of the Lebanon VAMC, opined that Plaintiff would not be able to sit, stand, or walk for a combined eight hours in an eight-hour workday. (Tr. 1069-73). On December 13, 2011, Plaintiff's treating psychiatrist, Dr. Joseph Barber, M.D., opined that Plaintiff was "not employable." (Tr. 986).

On February 27, 2012, Dr. Barber opined that:

 Matthew R. Hulstine has been followed in the Lebanon VAMC Behavioral Heal Clinic since June of 2006 for bipolar disorder and anxiety. I have been his psychiatrist since 9/6/11. His condition has been marked by barely marginal functioning, mood instability, poor sleep and concentration, irritability and agitation, poor stress tolerance and marked anxiety currently, all of which have adversely affected his ability to work. In recent years, he has experienced psychotic

symptoms    and    suicide    attempt    as    well,    with    psychiatric
hospitalizations that speak to the seriousness of his impairments...

(Tr. 1066).

The ALJ discounted Dr. Barber's opinion on the basis of an opinion from a

non-treating, non-examining state agency source, Dr. John Hower, Ph.D., from

May of 2010, three and a half years prior to the ALJ decision in October of 2013.

(Tr. 909-911). Dr. Hower opined that Plaintiff had no more than moderate mental

limitations in any area of work-related function. (Tr. 909-911). (Tr. 909-911). .Dr.

Hower explained that:

> The claimant claimed to be Bipolar, but the recent VA evaluation did
> not diagnose this condition. The records show that the staff viewed
> him as being manipulative, seemingly to obtain the medication he
> wanted. He was rated with a GAF of 60, which is not that limited. The
> VA staff noted that he could be very demanding and actually
> insulting, and then switch to a mode of social functioning wich they
> referred to as "schmoozing", or being very polite to by to win people
> over. These interactions show that he has some control of his social
> behavior. He attends church and will do public activities such as going
> to the movies and going shopping. He also attends school three days
> per week for two hours each day. These activities also suggest that he
> is capable of modulating his social behavior. He is able to perform
> practical tasks such as doing dishes, laundry and vacuuming.
>
> He uses a computer and handles his banking (though he stated his
> checkbook was not currently accurate). He states that he can
> understand instructions about as well as anyone else. His ADLs
> reflected limitations based on pain and physical factors rather than
> mental factors. He retains sufficient mental capacity to cope with
> simple SGA.
>
> The claimant's ability to understand and remember complex or
> detailed instructions is limited, however, he would be expected to
> understand and remember simple one and two step instructions. Stress

exacerbates his symptoms. He has a history of impulsive behavior. He can make simple decisions. Moreover, he is able to carry out very short and simple instructions. His frustration tolerance is low. He is capable of asking simple questions and accepting instruction. He is self-sufficient. Also, he evidences some limitation in dealing with work stresses and public contact. He retains the ability to perform repetitive work activities without constant supervision. There are no restrictions in his abilities in regards to adaptation.

(Tr. 909-911).

The ALJ discounted Dr. Scogno's opinion on the basis of an opinion from an examining source, Dr. Jessica Ward, D.O., from July of 2010. (Tr. 927-37). Dr. Ward opined that Plaintiff could sit, stand or walk for a combined eight-hours out of an eight-hour workday, but could not stand or walk more than four hours out of an eight-hour workday or lift more than ten pounds. (Tr. 927-37).

Neither non-treating source in 2010 was able to review the treating source opinions from 2012. Similarly, they were unable to review any of the medical evidence from May of 2010 through July of 2013, an additional 397 pages of medical records. (Tr. 969-1366). Subsequent records, including those from Dr. Barber, indicate that treating psychiatrists diagnosed him with bipolar disorder. (Tr. 911, 986, 999, 1106, 1144, 1216, 1248, 1269, 1282, 1309, 1327, 1364). Similarly, Dr. Hower noted that Plaintiff's GAF was 60, while subsequent records showed decreased GAF, including GAFs of 45 and 50, denoting serious symptoms. (Tr. 911, 986, 999, 1106, 1144, 1216, 1248, 1269, 1282, 1309, 1327, 1364). Plaintiff had altercations with neighbors, medical providers, security officers, and a

pizza delivery man, resulting in some criminal charges. (Tr. 1146, 1149-51, 1194-90, 1217, 1247).

During the relevant period, providers, including Dr. Barber and Dr. Scogno, observed objective findings, including abnormal psychomotor activity and movements, and anxiety (Tr. 1003); elevated white blood cell count and triglycerides (Tr. 991); anxious psychomotor activity (Tr. 985); multiple conflicts at the VA center (Tr. 1197); being "verbally abusive" (Tr. 1196); "pressured speech" (Tr. 1191); tachycardia even after multiple medications (Tr. 1181); "pacing in the hallway" (Tr. 1151); tense psychomotor activity and affect (Tr. 1144); "tired appearing" (Tr. 1088, 1282); bilateral hand tremors (Tr. 1248, 1268); and elevated triglycerides and lipids, "possibly medication related." (Tr. 1083).

## B.    Medical Records

Plaintiff obtained psychiatric care from the VAMC throughout the relevant period. (Tr. 867-908). As of 2006, his diagnoses were bipolar disorder, chronic back pain, history of frequent blood clots, and status/post filter insertion. (Tr. 871). In December of 2006, he was admitted on a psychiatric hospitalization. (Tr. 871).

On September 6, 2011, Plaintiff transferred psychiatric care at VAMC from Dr. Rashid to Dr. Joseph Barber, M.D. (Tr. 1002). Plaintiff reported sleeping only four to five hours per night, mood lability, frequent anxiety and worry, daily tearfulness, and increased nervousness as a side effect from seroquel. (Tr. 1003).

On mental status examination, Dr. Barber observed abnormal psychomotor activity and movements, and slight anxiety, and assessed a GAF of 50. (Tr. 1003). Dr. Barber assessed Plaintiff to have bipolar disorder by report and substituted Lamictal for seroquel, increased his ativan, and continued his other psychiatric medications. (Tr. 1003). Plaintiff's medications included lisinopril, metoprolol tartrate, mirtazapine (remeron), morphine, nitroglycerin, Percocet, simvastatin, venlaxafine, aspirin, and warfarin. (Tr. 1001). Plaintiff followed-up with Dr. Barber on October 18, 2011. (Tr. 998). Plaintiff reported that he had "improved," but continued to experience difficulty falling asleep, racing thoughts, and some daytime anxiety. (Tr. 998). Plaintiff's chronic pain was "controlled." (Tr. 998). Dr. Barber assessed Plaintiff to have a GAF of 55 and bipolar disorder by report. (Tr. 999). Dr. Barber decreased Plaintiff's remeron, increased his Lamictal, and continued his other psychiatric medications. (Tr. 999).

On November 17, 2011, Plaintiff followed-up with a primary care provider at VAMC for hyperlipidemia, chronic back pain, coronary artery disease, bipolar disorder, and history of hypercoagulable state. (Tr. 989). Plaintiff reported increased break-through pain, and his Percocet was increased. (Tr. 990). Lab results indicated elevated white blood cell count and triglycerides. (Tr. 991).

On December 13, 2011, Plaintiff followed-up with Dr. Barber. (Tr. 985). Plaintiff reported "very poor sleep," racing thoughts, and anxiety. (Tr. 985).

Plaintiff's psychomotor activity was anxious. (Tr. 985). Dr. Barber discontinued remeron, prescribed Ativan, assessed a GAF of 55, and wrote that given Plaintiff's "serious medical and mental conditions, he is not employable." (Tr. 986). Plaintiff participated in "recreation therapy" at the VAMC the same day. (Tr. 1213).

On January 12, 2012 Plaintiff had multiple conflicts at the VA center. (Tr. 1197). Plaintiff arrived at 6:30 a.m. for a 10:45 appointment for labwork, and he was "very rude and disrespectful" when staff informed him that he was early. (Tr. 1195). When a nurse was unable to draw blood from either arm, Plaintiff "became very verbally abusive," threw his arm up, and "stormed out of the room." (Tr. 1196). Another patient informed staff that Plaintiff had been "very verbally abusive" to the patient in the waiting room as well. (Tr. 1196). Providers contacted Plaintiff because his lab work had not been completed, and he was "very upset over needing to 'get stuck twice'….went home and took an Ativan." (Tr. 1196). Notes indicate a provider "asked [Plaintiff] to try and control his behavior when he is stressed…I am aware that this is difficult for him at times, however when he becomes aggressive it does not accomplish the task needed." (Tr. 1196). Later that day, Plaintiff presented to the emergency room for neck pain. (Tr. 1199). When providers asked Plaintiff if they could obtain x-rays, "he got upset and stated that if I am not able to do anything much for him, he would like to leave and stormed out

of the emergency department cursing at [them]…[they] never got to examine the patient and he was barely in the ED for more than five minutes." (Tr. 1198).

The next day, Plaintiff refused to get his lab work done. (Tr. 1194). He was "still upset from yesterday when 'that nurse couldn't get my blood." (Tr. 1194). Notes indicate "Clerk tried to explain to [Plaintiff] that he can't just walk-in to CHILL and get his labs drawn and did someone tell him he could? [Plaintiff] replied back 'I don't need permission.' Clerk asked if she could have the nurse speak to him. [Plaintiff] refused to speak to clinic nurse and verbalized 'I don't want that nurse to call me back either.'" (Tr. 1194). Plaintiff did not show-up for a lab appointment later that week. (Tr. 1194). On January 18, 2012, Plaintiff attended recreation therapy, and completed his lab work. (Tr. 1192).

Around 3:00 a.m. on January 27, 2012, Plaintiff presented to the VA emergency room for chest pain. (Tr. 1190). He was exhibiting "pressured speech and [had] multiple complaints such as cold [symptoms], fever, blister, chest pain, and neck pain." (Tr. 1191). Plaintiff was tachycardic when he arrived, and remained tachycardic after multiple medications when he stood up. (Tr. 1181). EKG indicated "borderline left axis deviation and non-specific 5T-T Nave changes, with a flipped T-wave in lead III, but basically no acute changes." (Tr. 1177). Plaintiff did not want to be admitted because he had to take his mother, who had cancer, to a doctor's appointment the next day. (Tr. 1175, 1181). Plaintiff

requested to be discharged at 8:00 a.m. because he had an appointment with Veteran's Affairs, and was required to sign a form indicating that he was leaving against medical advice because he had taken Dilaudid less than two hours earlier. (Tr. 1181). Records indicate that he attended recreation therapy that morning. (Tr. 1173).

On January 31, 2012, Plaintiff presented to the emergency department at the VA with left lower extremity pain. (Tr. 1168). Notes indicate that because Plaintiff was already taking Coumadin, treatment would not change even if there was a new DVT clot, so he declined undergoing an ultrasound. (Tr. 1155).

On February 2, 2012, Plaintiff presented to the emergency department at the VA for an "anxiety attack." (Tr. 1152). He had run out of lorazepam four days earlier, was hypertensive, pacing, and could not sit down. (Tr. 1153). He was muttering, "it's not you, I hate everybody." (Tr. 1151). After being transported to a room, he was "pacing in the hallway" and stated "I can't stay in that room." (Tr. 1151). Providers requested police presence for a physical examination, but Plaintiff stated "I'm not talking to you" and left the emergency department." (Tr. 1151). He did not want to be seen with a security officer in the room. (Tr. 1149). In a subsequent phone call follow-up, Plaintiff stated that he was "unsatisfied with his ED visit because 'I don't care for that lady' (Dr. Acharya)," and that after he went home, a friend provided him with Ativan. (Tr. 1151).

On February 3, 2012, Plaintiff called Dr. Barber and reported that he was "not doing well," with "very poor sleep," decreased appetite, racing thoughts, "isolating with marked irritability," worrying about "going off on somebody," a recent arrest for a conflict with a neighbor, "2 recent angry episodes at the VA," that ambien had not been helpful, and depression. (Tr. 1217). He was offered a range of medications to treat bipolar disorder, including Depakote, lithium, Risperdal, seroquel, and abilify, along with inpatient treatment, but declined. (Tr. 1217-18). Dr. Barber increased ativan and suggested Plaintiff take zyprexa. (Tr. 1218). A week later, Plaintiff reported improvement and decided not to start zyprexa. (Tr. 1218). Plaintiff was continuing to take at least twelve prescription medications for his various physical and mental diagnoses. (Tr. 1217). Plaintiff participated in recreation therapy on February 7, 2012. (Tr. 1146).

Plaintiff followed-up with Dr. Barber on February 14, 2012 and as a walk-in on February 24, 2012. (Tr. 1146). Plaintiff reported that he had an upcoming hearing for alleged harassment and increased stress. (Tr. 1146). Psychomotor activity and affect were "tense." (Tr. 1144). Plaintiff was allowed to temporarily increase Ativan, but instructed to reduce the dosage after several days. (Tr. 1145). Plaintiff attended recreation therapy on February 22, 2012. (Tr. 1138).

On March 2, 2012, Plaintiff applied for VA disability benefits. (Tr. 1113). Dr. John Movassaghi, M.D., a provider at the VAMC, completed a disability

questionnaire and examination. (Tr. 1113-1136). Dr. Movassaghi opined that "[t]here is marked limitation of physical activity. There are no symptoms at rest but less-than-ordinary (mild) physical activity results in cardiac symptoms such as fatigue, dyspnea, etc." (Tr. 1136). Dr. Movassaghi opined that Plaintiff's DVT and pulmonary embolism would result in "increased absenteeism," decreased mobility, weakness, fatigue, and pain. (Tr. 1135). Dr. Movassahi indicated that Plaintiff required at least monthly visits for exacerbations of his pulmonary impairments. (Tr. 1120). Dr. Movassaghi noted that Plaintiff had a stimulator in his back to help with muscle pain in his left leg. (Tr. 1122). Dr. Movassaghi noted a history of interpersonal relationship difficulties, depression, panic attacks, memory problems, loss of control/violence problems, homicidal symptoms, anxiety, confusion, sleep impairment, and suicidal symptoms. (Tr. 1123). Dr. Movassaghi noted that a psychiatrist would need to evaluate his mental capacity to perform work. (Tr. 1135). The form indicates that mental disorder evaluations must be conducted by a specialist, but the record does not contain a VA disability evaluation by a psychiatrist. (Tr. 1117).

Plaintiff attended recreation therapy on March 20, 2012 and March 26, 2012. (Tr. 1110, 1112). On May 1, 2012, he followed-up with Dr. Barber. (Tr. 1108). He was experiencing benefit with zyprexa, "more stable, less upset…somewhat less easily angered…anxiety somewhat less." (Tr. 1105). He also reported that he was

"frustrated." (Tr. 1105). On May 8, 2012, Plaintiff underwent a preventative health screening. (Tr. 1100). Plaintiff reported pain in his neck and requested pain management. (Tr. 1104). Lab results indicated increased triglycerides and LFTs, and providers indicated that Zyrexa might be responsible for the elevation. (Tr. 1098). On May 9, 2012, Plaintiff requested that Dr. Barber discontinue his Zyprexa. (Tr. 1107). Subsequent lab work indicated that lipids and triglycerides improved after he stopped taking Zyprexa. (Tr. 1093).

On August 28, 2012, Plaintiff reported that since stopping Zyprexa, he was "sleeping only 2 [hours a night] with racing thoughts, increased irritability, and some anxiety." (Tr. 1087). Dr. Barber observed that he was "tired appearing" and assessed a GAF of 45. (Tr. 1088). Dr. Barber prescribed trazodone for insomnia, lithium for bipolar disorder, and continued his other psychiatric medications. (Tr. 1088). The next month, testing indicated that his triglycerides and lipids were again elevated, "possibly medication related." (Tr. 1083).

On January 17, 2013, Plaintiff followed-up with Dr. Barber. (Tr. 1280). He had discontinued trazodone due to ineffectiveness and reported continued poor sleep. (Tr. 1280). He reported mood stability on lithium without adverse side effects. (Tr. 1280). He was "tired appearing" and assessed a GAF of 45. (Tr. 1282). Dr. Barber prescribed Lunesta for insomnia. (Tr. 1282). On March 20, 2013, Plaintiff followed-up an reported improved sleep, but increased stress, anxiety, and

worry. (Tr. 1267). He reported that his mood was "so-so" and he exhibited bilateral hand tremors. (Tr. 1268). Dr. Barber assessed a GAF of 50, decreased Plaintiff's lithium, and continued his other psychiatric medications. (Tr. 1269).

On May 30, 2013, Dr. Barber noted that Plaintiff reported increased stress leading to poor sleep and increased anxiety/worry. He reported using "lunesta up to 6 mg for sleep, and using more ativan, and sometimes, 2 mg. at a time." (Tr. 1271). Dr. Barber instructed Plaintiff's ativan and lunesta, but instructed him not to take more than 4 mg. of lunesta. (Tr. 1271). On July 13, 2013, Plaintiff reported sleeping only four hours per night, "some decreased stress," less anxiety and worry but continued irritability and "had a confrontation with a pizza delivery man recently." (Tr. 1247). He continued to exhibit hand tremors. (Tr. 1248). Dr. Barber continued Plaintiff's medications and assessed a GAF of 55. (Tr. 1248).

## V.     Plaintiff Allegations of Error

### A.     Omitted Treating Source Medical Opinion

Plaintiff asserts that the ALJ erred in failing to mention Dr. Movassaghi's opinion that Plaintiff's cardiac conditions caused a "marked limitation of physical activity," with fatigue and dyspnea after "less than ordinary (mild) physical activity." (Pl. Brief at 6). Defendant appears to assert that Dr. Movassaghi's statement was not a medical opinion, but the definition of medical opinion contained in 20 C.F.R. §404.1527(a) is "broad." *See Wrights v. Colvin*, No. 3:13-

CV-02516-GBC, 2015 WL 2344948, at *10 (M.D. Pa. May 14, 2015) (citing 20 C.F.R. §1527(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Defendant also asserts that Dr. Movassaghi's opinion was not reliable for various reasons. (Def. Brief at 20-21). However, Defendant's post-hoc rationalizations are insufficient to cure the ALJ's error in failing to mention Dr. Movassaghi's opinion. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013). In *Rice v. Colvin*, No. 3:13-cv-2879-MEM (M.D. Pa. Feb. 13, 2015), the undersigned explained:

> Plaintiff asserts that "[A]n ALJ is not permitted to ignore an opinion by a physician addressing a patient's capacity to work." (Pl. Brief at 10) (citing *Reefer v. Barnhart*, 326 F.3d 376, 381-82 (3d Cir. 2003); *Burnett v. Commissioner of S.S.A.*, 220 F.3d 112, 121 22 (3d Cir. 2000); *Brewster v. Heckler*, 786 F.2d 581, 585 (3d Cir. 1986)). Defendant responds that "[t]here is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." (Def. Brief at 18-19) (quoting *Hur v. Comm'r Soc Sec*, 94 F. App'x130, 133(3d Cir. 2004)). However, there *is* a requirement to evaluate every medical opinion. Section 1527(c) states that the ALJ "will evaluate every medical opinion we receive." *Id.* There is a heightened requirement in Section 1527(c)(2), which applies only to treating physicians. Section 1527(c)(2) states that ALJs "will *always give good reasons* in [the] *notice of determination or decision* for the weight we give your treating physician's opinion." *Id.* (emphasis added). A plain reading of this requirement indicates that an ALJ must always acknowledge a treating source opinion, and may not reject a treating physician's opinion with little or no explanation.

In *Reefer*, the ALJ had acknowledged a treating source opinion, but did not explain why he gave it less weight than a state agency opinion. *Reefer*, 326 F.3d at 382. The Third Circuit explained, "[i]n so holding, the ALJ disregarded Dr. Stevens's contrary report without explaining why he did so, thereby ignoring our mandate in *Fargnoli*. Accordingly, remand is required." *Id*. Similarly, in *Brewster*, the ALJ acknowledged a treating source opinion, but did not explain why it was assigned less weight than the state agency opinion. *Brewster*, 786 F.2d at 585. The Court remanded, explaining that "the ALJ must make clear on the record his reasons for rejecting the opinion of the treating physician." *Id*. Moreover, there is a requirement to discuss significant probative evidence that contradicts the ALJ's conclusion. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir.2001) ("Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided.")

Defendant contends that the ALJ discharged her duty by citing Dr. Taylor's "treatment notes." (Def. Brief at 19). However, the plain language of the Regulations requires the ALJ to "always" provide "reasons" for the "weight" assigned to an "opinion." An ALJ cannot discharge this obligation if he does not acknowledge an opinion. Defendant has not cited to any case that upheld an ALJ decision that did not discuss all of the medical opinions. Thus, the ALJ's failure to mention the treating source opinion is a procedural error that requires remand. *See Ray v. Colvin*, 1:13-CV-0073, 2014 WL 1371585, at *21 (M.D. Pa. Apr. 8, 2014) ("The cursory manner in which the ALJ rejected Dr. Jacob's opinions runs afoul of the regulation's requirement to " give good reasons" for not crediting the opinion of a treating source upon consideration of the factors listed above. While there may be sufficient evidence in the record to support the ALJ's ultimate decision that Plaintiff was not under a disability, and, thus, the same outcome may result from remand, the court cannot excuse the denial of a mandatory procedural protection on this basis.").

Defendant attempts to use post-hoc rationalizations to justify the omission of the treating physician opinion from the ALJ decision, noting that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best." (Def. Brief at

18) (quoting *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993)). However, form reports are only "weak evidence" when they are "unaccompanied by thorough written reports." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) (citing *Brewster v. Heckler,* 786 F.2d 581, 585 (3d Cir.1986)). Here, the treating physician's opinion was accompanied by his longitudinal treatment record. Moreover, when opinions are conclusory, SSR 96-5p emphasizes to the adjudicator the importance of making 'every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us.'" *Ferari v. Astrue,* CIV.A. 1:07-CV-01287, 2008 WL 2682507 at *6 (M.D. Pa. July 1, 2008) (Kane, C.J.). Regardless, the Court cannot uphold a decision based on post-hoc rationalizations. *See Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (Although a Court may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," review must be based on "the administrative record [that was] already in existence" before the agency, not "some new record made initially in the reviewing court or post-hoc rationalizations made after the disputed action). The Court is not in a position to weight Dr. Taylor's opinion in the first instance. The Court recommends remand for the ALJ to evaluate Dr. Taylor's opinion.

*Id.*; *see also* 20 C.F.R. § 404.1527(e)(2)(ii) ("the administrative law judge *must* explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist, as the administrative law judge *must do* for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us") (emphasis added). The Court recommends remand for the ALJ to consider Dr. Movassaghi's opinion.

## B.      Treating Source Medical Opinions

### 1.      Applicable Law

The only evidence inconsistent with Dr. Barber's opinion was the ALJ's lay reinterpretation of medical evidence and a medical opinion from a non-treating, non-examining source who did not review the entire record. Doc. 10. The only evidence inconsistent with Dr. Scogno's opinion was the ALJ's lay reinterpretation of medical evidence and a consultative opinion from more than three years prior to the ALJ's decision. Doc. 10.

Pursuant to 20 C.F.R. §404.1527(c)(2) and SSR 96-5p, the ALJ must assign controlling weight to any well-supported treating source opinion and adopt it in the RFC unless it is inconsistent with other substantial evidence. *Id.* Pursuant to SSR 96-6p, an ALJ may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p. SSR 96-6p does not define "appropriate circumstances," but provides an example: when the non-treating, non-examining source was able to review a "complete case record…which provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.* This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the phrase "appropriate circumstances" should be construed as a similarly compelling reason.

*See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration").

Lay reinterpretation of medical evidence is not substantial inconsistent evidence. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016; *Tilton v. Colvin*, No. 1:14-CV-02219-YK-GBC, 2016 WL 1580003, at *1 (M.D. Pa. Mar. 31, 2016), *report and recommendation adopted*, No. 1:14-CV-2219, 2016 WL 1569895 (M.D. Pa. Apr. 19, 2016) (citing *Frankenfield v. Bowen,* 861 F.2d 405, 408 (3d Cir. 1988); *Doak v. Heckler,* 790 F.2d 26, 29–30 (3d Cir. 1986); *Ferguson v. Schweiker,* 765 F.2d 31, 37, 36–37 (3d Cir. 1985); *Kent v. Schweiker,* 710 F.2d 110, 115 (3d Cir. 1983); *Van Horn v. Schweiker,* 717 F.2d 871, 874 (3d Cir. 1983); *Kelly v. R.R. Ret. Bd.,* 625 F.2d 486, 494 (3d Cir. 1980); *Rossi v. Califano,* 602 F.2d 55, 58–59, (3d Cir. 1979); *Fowler v. Califano,* 596 F.2d 600, 603 (3d Cir. 1979); *Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir. 1978)). These cases hold that, even under the deferential substantial evidence standard of review, lay reinterpretation of medical evidence is not inconsistent substantial evidence.

The Social Security Administration retained, rather than abrogated, this common-law when it promulgated 20 C.F.R. §404.1527(c). *Id.* (citing *Burns v.*

*Colvin,* No. 1:14–CV–1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016). After

these cases were decided, the Social Security Administration promulgated

regulations addressing medical opinions for the first time. *See* Standards, 56 FR

36932-01 at 36936. Regulatory enactments retain, rather than abrogate, pre-

existing common law unless the enactments are incompatible with existing

common-law or there is evidence of a clear intent to abrogate. *See Burns v. Colvin*,

No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (citing *United*

*States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993);

*Sebelius v. Cloer*, ——U.S. ——, 133 S.Ct. 1886, 1896, 185 L.Ed.2d 1003 (2013);

*Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–254, 112 S.Ct. 1146, 117

L.Ed.2d 391 (1992);  *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 543, 114 S.Ct.

1757, 128 L.Ed.2d 556 (1994)). The party asserting that the enactment abrogates

common law bears the burden of overcoming this presumption. *See Green v. Bock*

*Laundry Mach. Co.*, 490 U.S. 504, 521, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989).

The controlling weight provision, 20 C.F.R. §404.1527(c)(2), codifies the

treating source rule and is compatible with *Frankenfield*, *Doak*, *Ferguson*, *Kent*,

*Van Horn*, *Kelly*, *Rossi*, *Fowler*, and *Gober* for any uncontradicted, well-supported

treating source opinion. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269

(M.D. Pa. Jan. 13, 2016). Specifically, 20 C.F.R. § 404.1527(c)(2) provides that, if

a treating source opinion is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the ALJ must "give it controlling weight." *Id.* The Regulations do not define other "inconsistent….substantial evidence." *Id. Frankenfield*, *Doak*, *Ferguson*, *Kent*, *Van Horn*, *Kelly*, *Rossi*, *Fowler*, and *Gober* hold that lay reinterpretation of medical evidence does not constitute "inconsistent . . . substantial evidence." *See Gober*, 574 F.2d at 777; *Frankenfield*, 861 F.2d at 408; *Doak*, 790 F.2d at 29-30; *Ferguson*, 765 F.2d at 36-37; *Kent*, 710 F.2d at 115; *Van Horn*, 717 F.2d at 874; *Kelly*, 625 F.2d at 494; *Rossi*, 602 F.2d at 58-59; *Fowler*, 596 F.2d at 603. *Frankenfield*, *Doak*, *Ferguson*, *Kent*, *Van Horn*, *Kelly*, *Rossi*, *Fowler* and *Gober* provide the definition for the regulatory language "inconsistent…substantial evidence." 20 C.F.R. §404.1527(c)(2). *Frankenfield*, *Doak*, *Ferguson*, *Kent*, *Van Horn*, *Kelly*, *Rossi*, *Fowler*, and *Gober* and 20 C.F.R. §404.1527(c)(2) are compatible.[1]

The intent to codify, rather than change, the existing law with 20 C.F.R. §404.1527(c) has been noted by Congress, the Supreme Court, and the Social Security Administration itself. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) (citing Standards for Consultative

---

[1] The guidance from the SSA explicitly contemplates that non-medical evidence can provide substantial inconsistent evidence, but does not explicitly address whether lay reinterpretation of medical evidence constitutes substantial inconsistent evidence. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01 at 36934.

Examinations and Existing Medical Evidence, 56 FR 36932–01 at 36934 ("[T]he majority of the circuit courts generally ... agree that treating source evidence tends to have a special intrinsic value by virtue of the treating source's relationship with the claimant ... [and] if the Secretary decides to reject such an opinion, he should provide the claimant with good reasons for doing so. We have been guided by these principles in our development of the final rule"); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 823, 123 S.Ct. 1965, 1966, 155 L.Ed.2d 1034 (2003) ("The treating physician rule ... was originally developed by Courts of Appeals ... In 1991, the Commissioner of Social Security adopted regulations approving and formalizing use of the rule in the Social Security disability program")).

Other Circuits have also explicitly retained the prohibition on lay reinterpretation of medical evidence. *See Balsamo v. Chater*, 142 F.3d 75, 80-81 (2d Cir. 1998); *Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009); *Burgess v. Astrue*, 537 F.3d 117, 131 (2d Cir. 2008); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004); *Harbor v. Apfel*, 242 F.3d 375 (8th Cir. 2000); *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995). When a Court of Appeals issues a decision that the SSA determines is contradictory to the intended interpretation of a regulation, the SSA must issue an Acquiescence Ruling. 20 C.F.R. § 404.985(b)(1) ("We will release an Acquiescence Ruling for

publication in the Federal Register for any precedential circuit court decision that we determine contains a holding that conflicts with our interpretation of a provision of the Social Security Act or regulations no later than 120 days from the receipt of the court's decision."). More than 120 days has passed since these decisions, and the SSA has not promulgated an Acquiescence Ruling regarding any of these decisions. *Cf. Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016) (Absent a Social Security Ruling, Acquiescence Ruling, or Regulation indicating the SSA's interpretation, SSA's position in this case is "nothing more than a convenient litigating position, or a post hoc rationalization advanced by an agency seeking to defend past agency action against attack") (quoting *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-21667 (2012)).

Congress has since amended the Act to require medical expert review of the medical evidence for any claimant who establishes any medically determinable impairment. *See* BIPARTISAN BUDGET ACT OF 2015, PL 114–74, November 2, 2015, 129 Stat 584, § 832(a). This change is particularly notable given the context of the other amendments to the Act, which were generally designed to save costs for the Administration.[2] This amendment recognizes that medical evidence

---

[2] Subtitle A, entitled "Ensuring Correct Payments and Reducing Fraud," expands fraud investigation units nationwide, prohibits the Commissioner from considering evidence from medical providers who have been convicted of certain crimes,

requires review by an individual with medical training, rather than lay interpretation. *See also North Haven Board of Education v. Bell,* 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ( "Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions'") (quoting *Cannon v. Univ. of Chi.,* 441 U.S. 677, 686 n. 7, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); (*INS v. Cardoza–Fonseca,* 480 U.S. 421, 430, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

In similar cases before the undersigned, Defendant frequently cites *Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011); *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356 (3d Cir. 2011); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008); *Plummer v. Apfel*, 186 F.3d 422 (3d Cir. 1999); *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991); *Cummings v. Colvin*, 129 F. Supp. 3d 209, 216 (W.D. Pa. 2015); and  *Gallo v. Colvin*, No. 4:15-CV-0167, 2016 WL 2936547, at *1 (M.D. Pa. May 13, 2016). [3] None of these cases support Defendant's claims. *Jones* was

---

creates "new and stronger penalties" for Social Security fraud, and requires electronic payroll data to improve efficient administration. *Id.* §§ 811–831.

[3] Defendant frequently cites these cases for the first time in objections, which precludes the undersigned Magistrate Judge from meaningfully addressing them. When parties "raise [an] argument…or the first time in her objections to the Magistrate Judge's Report and Recommendations," Courts may "deem this argument waived. *Jimenez v. Barnhart*, 46 F. App'x 684, 685 (3d Cir. 2002) (citing *Laborers' Int'l Union of N.A. v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir.1994)). However, the undersigned will address these cases because Defendant

decided before the SSA promulgated the controlling weight provision, and involved multiple consistent non-treating opinions that supported the ALJ's determination. *See Jones*, 954 F.2d at 129.  In *Brown* and *Gallo*, the non-treating, non-examining source reviewed a complete record. *Brown*, 649 F.3d at 196; *Gallo*, No. 4:15-CV-0167, 2016 WL 2936547, at *1. In *Chandler*, *Johnson*, and *Plummer*, the ALJ was not faced with rejecting a treating source medical opinion with non-treating source opinions. Specifically, in *Chandler* there was no treating source medical opinion before the ALJ. *Id.* at 360-63.[4] In *Johnson* the treating source medical opinion supported the ALJ's decision because it indicated the claimant did not become disabled until after the date last insured.  *Johnson*, 529 F.3d at 201-03 In *Plummer*, the ALJ relied on three *treating* source medical opinions to reject another treating source medical opinion.

---

often cites them, without acknowledging that *Morales* and *Brownawell* are binding, precedential decisions that actually address an ALJ who rejects a treating source medical opinion with only a single non-treating, non-examining medical source opinion and/or lay reinterpretation of medical evidence.

[4] There were statements from a nurse practitioner, but a nurse practitioner is not an acceptable medical source. *Id.* "[O]nly 'acceptable medical sources' can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight." SSR 06-3p. Consequently, they may never be entitled to controlling weight and are not entitled to the treating source rule. *See* 20 C.F.R. §404.1527(c)(2); SSR 06-3p. The claimant submitted two medical opinions in support of her claim, but not until after the ALJ decision. *Chandler*, 667 F.3d at 360. The Third Circuit excluded these from consideration because Plaintiff had no good cause for not submitting them prior to the ALJ decision. *Id.* (citing *Matthews v. Apfel*, 239 F.3d 589, 595 (3d Cir. 2001).

*Cummings* erroneously relies on *Chandler* without recognizing that *Chandler* did not involve a treating source medical opinion before the ALJ. *Cummings*, 129 F. Supp. 3d at 216. The District Court in *Cummings* wrote that "[i]f *Doak* actually stood for the rule espoused by Plaintiff, the Court of Appeals in *Chandler* would have surely attempted to reconcile its reasoning with that of *Doak.* It had to be aware of *Doak,* as the district court made it a centerpiece of its reasoning. Yet the Court of Appeals said nothing." *Cummings v. Colvin*, 129 F. Supp. 3d 209, 216 (W.D. Pa. 2015). The undersigned respectfully disagrees. *Doak* and *Chandler* dealt with separate issues. In *Chandler*, there were no treating source medical opinions before the ALJ, so the only issue was whether the ALJ could rely on an uncontradicted medical opinion from a non-treating, non-examining source. In *Doak*, there was a treating source medical opinion before the ALJ. Consequently, *Chandler*'s failure to cite *Doak* cannot be construed to limit *Doak*'s application to cases involving a treating source medical opinion before the ALJ.

The Third Circuit has issued two precedential decisions involving an ALJ who assigns less than controlling weight to a treating source medical opinion with only a non-examining, non-treating source who did not review a complete record and lay reinterpretation of medical evidence: *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) and *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352 (3d Cir. 2008). Both cases held that the ALJ lacked substantial evidence to deny benefits.

*Id.* In a plethora of cases, the Third Circuit has held that lay reinterpretation of medical evidence does not provide substantial evidence to deny benefits when there is a supported treating source medical opinion. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) (internal citations omitted). The Court may not deviate from *Morales* and *Brownawell* based on dicta in *Brown*, *Chandler*, *Johnson*, *Plummer*, or *Jones v. Sullivan*, 954 F.2d 125 (3d Cir. 1991). *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) (citing *Kool, Mann, Coffee & Co. v. Coffey,* 300 F.3d 340, 355 (3d Cir.2002) (Statements that are "not necessary to the actual holding of the case" are "dicta" and "not binding"); *Calhoun v. Yamaha Motor Corp.,* 216 F.3d 338, 344 n. 9 (3d Cir.2000) ("Insofar as this determination was not necessary to either court's ultimate holding, however, it properly is classified as dictum. It therefore does not possess a binding effect on us pursuant to the 'law of the case' doctrine."); *Chowdhury v. Reading Hosp. & Med. Ctr.,* 677 F.2d 317, 324 (3d Cir.1982) ("[D]ictum, unlike holding, does not have the strength of a decision 'forged from actual experience by the hammer and anvil of litigation,' a fact to be considered when assessing its utility in the context of an actual controversy. Similarly, appellate courts must be cautious to avoid promulgating unnecessarily broad rules of law.") (quotations omitted).

The ALJ is bound by SSR 96-6p. *See* 20 C.F.R. § 402.35(b)(1) (Social Security Rulings are "binding on all components of the Social Security Administration").  Moreover, *Auer* deference "ordinarily calls for deference to an agency's interpretation of its own ambiguous regulation." *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166, 183 L. Ed. 2d 153 (2012) (citing *Auer v. Robbins*, 519 U.S. 452, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997)). SSR 96-6p is the Social Security Administration's interpretation of 20 C.F.R. §404.1527(c), so it is entitled to deference by the Courts.  *See* SSR 96-6p.  In contrast, Defendant's position in this case is nothing more than a "'convenient litigating position,'" or a '*post hoc* rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." *SmithKline Beecham Corp.*, 132 S. Ct. at 2166-67 (quoting *Bowen v. Georgetown Univ. Hospital,* 488 U.S. 204, 213, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) *Auer, supra,* at 462, 117 S.Ct. 905)).

The ALJ and the District Court are bound by precedential Third Circuit decisions. *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269, at *1 (M.D. Pa. Jan. 13, 2016) ("When binding precedent squarely addresses an issue, the District Court may not deviate from that precedent based on dicta") (citing *Bd. of Trustees of Bricklayers & Allied Craftsmen Local 6 of New Jersey Welfare Fund v. Wettlin Associates, Inc.*, 237 F.3d 270, 275 (3d Cir.2001) ("To the extent it applied

dicta ... the District Court erred")); 20 C.F.R. § 404.985(a)("We will apply a holding in a United States Court of Appeals decision that we determine conflicts with our interpretation of a provision of the Social Security Act or regulations unless the Government seeks further judicial review of that decision or we relitigate the issue presented in the decision").[5] As the Third Circuit explained in *Jamison v. Klem*, 544 F.3d 266, 278 n. 11 (3d Cir. 2008):

> We also reject the District Court's reliance on *Voils v. Hall,* 151 Fed.Appx. 793, 795 (11th Cir.2005). We have steadfastly attempted to discourage District Courts as well as attorneys from relying on nonprecedential opinions of this court. *See* Third Circuit Internal Operating Procedure 5.7 (indicating that "the court by tradition does not cite to its not precedential opinions as authority"). *See also, Fallon Elec. Co. v. Cincinnati Insur. Co.,* 121 F.3d 125, 128 n. 1 (3d Cir.1997) ( "[We] do not regard such opinions as binding precedent."). We do not accept these opinions as binding precedent because, unlike precedential opinions, they do not circulate to the entire court before they are filed. Accordingly, not every judge on the court has had an opportunity to express his/her views about the opinion before it is filed.

> Here, the District Court relied on a decision that is not only not precedential, it is not even a decision of a panel of this court. Accordingly, we will not explain why we think that decision is ill-advised and poorly reasoned.

---

[5] The Social Security Administration abolished its policy of nonacquiescene in 1990. *See Hyatt v. Barnhart*, 315 F.3d 239, 242 (4th Cir. 2002) ("The SSA ended its policy of nonacquiescence"); *Mannella v. Astrue*, No. CV06-469-TUC-CKJ BPV, 2008 WL 2428868, at *14 (D. Ariz. Feb. 20, 2008), *report and recommendation adopted in part, rejected in part,* No. CIV06-469-TUC-CKJ BP, 2008 WL 2428869 (D. Ariz. June 12, 2008) ("The Social Security Administration followed a 'nonacquiescence' policy for a number of years…The Social Security Administration ("SSA") has since issued regulations which require that the SSA apply a Circuit Court of Appeals decision"); 20 C.F.R. §404.985(a).

*Id.* at 278 n. 11. The District Court may not deviate from binding precedent in *Brownawell*, *Morales*, *Diaz*, and *Brown* based on non-precedential decisions. *Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317; *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009); *Brown*, 649 F.3d at 196.

## 2.    Analysis

Plaintiff asserts that the ALJ erred in crediting Dr. Hower's and Dr. Ward's non-treating medical opinions over Dr. Barber's, Dr. Scogno's, and Dr. Movassaghi's treating source medical opinions. (Pl. Brief).

In discussing the opinion evidence, Defendant cites no case law. (Def. Brief at 18-23). Defendant asserts that the ALJ "will not give any special significance to the source of another opinion on this issue." (Def. Brief at 18). However, as discussed above, the ALJ must give controlling weight to any well-supported treating source medical opinion unless the ALJ identifies substantial inconsistent evidence, and the ALJ must adopt controlling opinions in the RFC. *See* 20 C.F.R. §404.1527(c)(2); SSR 96-5p.

Dr. Barber was an acceptable medical source. (Tr. 1066); 20 C.F.R. §404.1527(a). Dr. Barber was also a treating source because Dr. Barber treated Plaintiff "a number of times and long enough to have obtained a longitudinal picture of [Plaintiff's] impairment[s]." 20 C.F.R. § 404.1527(c)(2).  Dr. Barber's statement is a medical opinion "on the issue(s) of the nature and severity of

[Plaintiff's] impairment(s)," and was not a statement on an issue reserved to the Commissioner. 20 C.F.R. §404.1527(c)(2). Thus, the ALJ must assign Dr. Barber's opinion controlling weight if it is well-supported and not inconsistent with other substantial evidence. *Id.*

The ALJ erred in finding that Dr. Barber's opinion was not well-supported. (Tr. 200). The Administration "changed the term 'fully supported' to 'well-supported' because" the Administration:

> [A]greed with commenters who pointed out that 'fully supported' was unclear and that, more important, it was an impractically high standard which, even if it were attainable, would essentially make any opinion superfluous. We believe that the new term, 'well-supported,' is more practicable and more reasonable; it should make clear that we will adopt opinions that are well-supported by medically acceptable clinical and laboratory diagnostic techniques unless they are inconsistent with substantial evidence in the record.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01 at 36936. Dr. Barber's opinion was supported by objective findings, including During the relevant period, providers, including Dr. Barber and Dr. Scogno, observed objective findings, including abnormal psychomotor activity and movements, and anxiety (Tr. 1003); elevated white blood cell count and triglycerides (Tr. 991); anxious psychomotor activity (Tr. 985); multiple conflicts at the VA center (Tr. 1197); being "verbally abusive" (Tr. 1196); "pressured speech" (Tr. 1191); tachycardia even after multiple medications (Tr. 1181); "pacing in the hallway" (Tr. 1151); tense psychomotor activity and affect (Tr.

1144); "tired appearing" (Tr. 1088, 1282); bilateral hand tremors (Tr. 1248, 1268);

and elevated triglycerides and lipids, "possibly medication related." (Tr. 1083).

Moreover, the Administration explained:

Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.

Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is one of the principal provisions of this set of rules. See §§ 404.1512(d) and 416.912(d) of these final regulations. Far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR

36932–01, 36951–36952; *see also* 20 C.F.R. § 404.1512(d) ("We will make every

reasonable effort to help you get medical reports from your own medical sources

when you give us permission to request the reports"); SSR 96-5p ("Because

treating source evidence (including opinion evidence) is important, if the evidence

does not support a treating source's opinion on any issue reserved to the

Commissioner and the adjudicator cannot ascertain the basis of the opinion from

the case record, the adjudicator must make 'every reasonable effort' to recontact

the source for clarification of the reasons for the opinion"). There is no evidence

in the record that the ALJ attempted to recontact Dr. Barber.

In other cases before the undersigned, Defendant contends that the Regulations no longer require recontact based on 20 C.F.R. §404.1520b. However, while 20 C.F.R. §404.1520b allows an ALJ to request a consultative examination, or obtain information from other sources, rather than recontacting a treating source, 20 C.F.R. §404.1512(e) still provides that "[g]enerally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources." *Id.* As the commentary to 20 C.F.R. §404.1520b explains:

> [W]e disagree that these rules would permit adjudicators to purchase CEs rather than develop evidence from a person's medical source(s). We have regulations that govern the purchase of CEs, and those regulations provide, in part, that "Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your own medical sources." Other CE regulations underscore this point by providing that "If your medical sources cannot or will not give us sufficient medical evidence about your impairment, we may ask you to have one or more physical or mental examinations. Our CE regulations also provide that before purchasing a CE, we will consider your "existing medical reports." It is also important to note that, subject to certain requirements, "your treating source will be the preferred source to do the purchased examination." We believe these regulations provide sufficient safeguards against any potential abuse of the CE process.

How We Collect and Consider Evidence of Disability, 77 FR 10651-01.

Moreover, 20 C.F.R. §404.1520b does not automatically exempt the ALJ from recontacting treating sources. The Commentary explains:

> [T]here are times when we would still expect adjudicators to recontact a person's medical source first; that is, when recontact is the most

effective and efficient way to obtain the information needed to resolve an inconsistency or insufficiency in the evidence received from that source. In the NPRM, **we also gave two examples of situations where we would expect adjudicators to contact the medical source first**, **because the additional information needed is directly related to that source's medical opinion.** In fact, **we expect that adjudicators will often contact a person's medical source(s) first whenever the additional information sought pertains to findings, treatment, and functional capacity**, because the treating source may be the best source regarding these issues.

How We Collect and Consider Evidence of Disability, 77 FR 10651-01 (emphasis added). One of the examples in the NPRM was when there was an alleged lack of objective supported for a treating source medical opinion. How We Collect and Consider Evidence of Disability, 76 FR 20282-01. Consequently, recontact is still required when the issue is an alleged lack of support for a treating source medical opinion. *Id.*[6]

Defendant asserts that Plaintiff's daily activities contradict the treating source medical opinions. (Def. Brief at 18-23). The Administration promulgated guidance that non-medical evidence, like activities of daily living that contradict the opinion, may provide substantial inconsistent evidence in "extremely rare" cases. *See* Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936; *Torres v. Barnhart*, 139 F. App'x 411, 414

---

[6] Regardless, the ALJ did not attempt to obtain any additional information after the treating source opinions in this case were submitted to resolve the conflict the treating source opinions created with the earlier non-treating opinions, so the ALJ did not comply with 20 C.F.R. §404.1520b. Doc. 10.

(3d Cir. 2005) (ALJ permissibly rejected treating opinion "in combination with other evidence of record including Claimant's own testimony"); *Kays v. Colvin*, No. 1:13-CV-02468, 2014 WL 7012758, at *7 (M.D. Pa. Dec. 11, 2014); *Marr v. Colvin*, No. 1:13-cv-2499 (M.D.P.A. April 15, 2015). However, the "non-medical" evidence must be truly "inconsistent" with the opinion. Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at 36936; *see also Chunn v. Barnhart*, 397 F.3d 667, 672 (8th Cir. 2005) ("the ALJ's decision fails to explain how Chunn's activities and behaviors are inconsistent with Dr. Ziolkow's characterization of her mental capacity.").

The non-medical evidence did not contradict Dr. Barber's opinion. Plaintiff reported and testified that she could perform some activities of daily living on a sporadic and transitory basis that allowed for breaks as needed. Plaintiff testified that he had constant back pain radiating to his legs, angina, swelling in his legs, shortness of breath on exertion, mania, problems handling stress, depression, isolation, mood swings, trouble sleeping, and difficulty walking, standing, and sitting. (Tr. 216-10, 220-33, 254-50, 258-68). Plaintiff was able to change a flat tire, attend college classes, perform personal care activities, perform some chores, drive a car, manage money, attend sporting events, attend church, swim, and go to the movies. (Tr. 202, 459-63, 599). Plaintiff attended some college classes for one semester, in the Spring of 2010. (Tr. 1017). He was enrolled for an introductory

reading course in the fall 2010 semester, but academic records indicate that he "never attended class." (Tr. 1017.)

These activities do not contradict Dr. Barber's opinion that Plaintiff suffered marked mental limitations. Plaintiff's inability to attend a single remedial reading class in the fall of 2010 supports, rather than undermines, Dr. Barber's opinion. (Tr. 1017). Plaintiff's ability to attend some college courses in the spring 2010, contrasted by his inability to attend any college courses in the fall of 2010, also demonstrates that Dr. Hower's inability to review records after the spring of 2010 renders his opinion less persuasive. (Tr. 1017).

Dr. Hower's  inability to review the entire record required the ALJ to engage in impermissible lay interpretation of medical evidence. *See Gober*, 574 F.2d at 777; *Frankenfield*, 861 F.2d at 408; *Doak*, 790 F.2d at 29-30; *Ferguson*, 765 F.2d at 36-37; *Kent*, 710 F.2d at 115; *Van Horn*, 717 F.2d at 874; *Kelly*, 625 F.2d at 494; *Rossi*, 602 F.2d at 58-59; *Fowler*, 596 F.2d at 603. Dr. Hower's opinion was three and a half years prior to October 31, 2013, the date of the ALJ decision. Dr. Hower relied on a lack of a bipolar diagnosis, while subsequent records, including those from Dr. Barber, indicate that treating psychiatrists diagnosed him with bipolar disorder. (Tr. 911, 986, 999, 1106, 1144, 1216, 1248, 1269, 1282, 1309, 1327, 1364). Similarly, Dr. Hower noted that Plaintiff's GAF was 60, while subsequent records showed decreased GAF, including GAFs of 45 and 50,

denoting serious symptoms. (Tr. 911, 986, 999, 1106, 1144, 1216, 1248, 1269, 1282, 1309, 1327, 1364). The ALJ does not acknowledge any GAF score other than the GAF of 60 noted in Dr. Hower's report. (Tr. 189-208, 294-311). The ALJ does not mention Plaintiff's bipolar diagnoses or explain why they are either not medically determinable or not severe. (Tr. 189-208, 294-311).

Moreover, many of the rationales used by Dr. Hower and the ALJ to dismiss Plaintiff's psychiatric symptoms are symptoms themselves of narcissistic personality disorder. With regard to "schmoozing," according to the *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*; APA, 2000) ("DSM-IV-TR"), individuals with narcissistic personality disorder "may constantly fish for compliments, often with great charm." DSM-IV-TR at 715. With regard to impatiently leaving hospitals against medical advice, the DSM-IV-TR indicates that "[t]hey expect to be catered to and are puzzled or furious when this does not happen. For example, they may assume that they do not have to wait in line and that their priorities are so important that others should defer to them, and then get irritated when others fail to assist….They expect to be given whatever they want or feel they need, no matter what it might mean to others." DSM-IV-TR at 715. With regard to being manipulative, the DSM-IV-TR provides that their "sense of entitlement may result in the conscious or unwitting exploitation of others." DSM-IV-TR at 715. With regard to rudeness and explosive behavior, the DSM-IV-TR

provides that "they may react with disdain, rage, or defiant counterattack." DSM-IV-TR at 715. The DSM-IV-TR notes that "vocational functioning can be very low, reflecting an unwillingness to take a risk in competitive or other situations in which defeat is possible. Sustained feelings of shame or humiliation and the attendant self-criticism may be associated with social withdrawal, depressed mood, and Dysthymic or Major Depressive Disorder. In contrast, sustained periods of grandiosity may be associated with a hypomanic mood." DSM-IV-TR at 716. Consequently, Dr. Hower and the ALJ rejected Plaintiff's claimed disability from symptoms of narcissistic personality disorder because he was suffering common symptoms of narcissistic personality disorder. This constitutes rejecting evidence for no reason or the wrong reason. *See Morales v. Apfel*, 225 F.3d 310, 317-18 (3d Cir. 2000)

Dr. Hower opined that Plaintiff had "no limitation" in responding to changes in the work setting, "no limitation" in "getting along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "no limitation" in maintaining socially appropriate behavior. (Tr. 910). However, when faced with an unexpected change, such as learning an appointment was at 10:45, not 6:30, Plaintiff became "very verbally abusive" to medical staff and other patients. Plaintiff was unable to cope when a nurse was unable to draw blood. After this incident, Plaintiff was unable to cope when he returned to the facility and staff

requested the presence of a security guard. (Tr. 1149-51).   ALJs and the Courts must follow the law. The law does not allow ALJs to deny disability benefits because a claimant is rude, particularly when rudeness is a standard symptom of one of the claimant's mental diagnoses. Under the law, disability as a result of a narcissistic or explosive personality disorder is no less legitimate than disability as a result of any other impairment, even if a personality disorder makes a claimant less likeable.

The ALJ has not provided "good reasons" or identified "appropriate circumstances" to assign less than controlling weight to Dr. Barber's opinion with only Dr. Hower. Unlike *Brown*, the Dr. Hower did not review a complete case record, and like *Morales* and *Brownawell*, the ALJ was required to undertake lay reinterpretation of significant medical evidence to supplant the treating source opinion, and the non-medical evidence was consistent with Dr. Barber's opinion. *See Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009); *Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317; SSR 96-6p, 20 C.F.R. §404.1527(c)(2); *see also Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *13 (M.D. Pa. Feb. 23, 2016) (Noting that expert "reviewed records…through November 2012" and "the record does not appear to contain….treatment records which post date [the expert's] opinion"); *Garcia v. Colvin*, No. 3:15-CV-0171, 2016 WL 1695104, at *15 (M.D. Pa. Apr. 26, 2016) (Nealon, J.) (Remanding because the ALJ erred in

relying on non-examining, non-treating physician where "the entire medical record was not available to the non-examining, non-treating physician").

Defendant's brief either repeats the ALJ's reasoning or provides improper post-hoc rationalizations. (Def. Brief); *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) ("review must also be based on the administrative record [that was] already in existence before the agency, not…post-hoc rationalizations made after the disputed action") (internal quotation omitted). The Court recommends remanding the case for further evaluation of Dr. Barber's opinion pursuant to SSR 96-6p, 20 C.F.R. §404.1527(c) and *Diaz, Brownawell*, *Morales*, *Frankenfield*, *Doak*, *Ferguson*, *Kent*, *Van Horn*, *Kelly*, *Rossi*, *Fowler* and *Gober*. *See* SSR 96-6p; 20 C.F.R. §404.1527(c)(2); *Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317; *Gober*, 574 F.2d at 777; *Frankenfield*, 861 F.2d at 408; *Doak*, 790 F.2d at 29-30; *Ferguson*, 765 F.2d at 36-37; *Kent*, 710 F.2d at 115; *Van Horn*, 717 F.2d at 874; *Kelly*, 625 F.2d at 494; *Rossi*, 602 F.2d at 58-59; *Fowler*, 596 F.2d at 603.

## C.    Other Allegations of Error

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## D.    Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)).

## VI.    Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to

which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 25, 2016                    _____s/Gerald B. Cohn_____
                                          GERALD B. COHN
                                          UNITED STATES MAGISTRATE JUDGE